J-S57021-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.L.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.L.W., JR., FATHER | : | No. 1004 MDA 2019 |

Appeal from the Decree Entered May 28, 2019
In the Court of Common Pleas of Columbia County
Orphans' Court at No: 182-OC-2018,
CP-19-DP-0000045-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: D.A.L.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.L.W., JR., FATHER | : | No. 1005 MDA 2019 |

Appeal from the Decree Entered May 28, 2019
In the Court of Common Pleas of Columbia County
Orphans' Court at No: 2018-OC-0000180-RT,
CP-19-DP-0000044-2016

| | | |
|---|---|---|
| IN RE: L.D.R.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.L.W., JR., FATHER | : | No. 1006 MDA 2019 |

Appeal from the Decree Entered May 28, 2019
In the Court of Common Pleas of Columbia County
Orphans' Court at No: 181-OC-2018,

J-S57021-19

BEFORE: BOWES, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY STABILE, J.: **FILED JANUARY 27, 2020**

J.L.W., Jr. ("Father"), appeals from the decrees entered May 28, 2019, which terminated involuntarily his parental rights to his daughters, D.A.L.W., born in October 2010, J.L.W., born in March 2014, and L.D.R.W., born in November 2015 (collectively, "the Children").[1] After careful review, we affirm.

The record reveals that Columbia County Children and Youth Services ("CYS") obtained emergency custody of the Children on August 15, 2016. N.T., 5/1/19, at 18. CYS obtained custody because Mother was residing with "an alleged perpetrator"[2] and because she admitted to using two bags of heroin earlier that day. *Id.* In addition, Father was unavailable to care for the Children because he lacked appropriate housing. *Id.* The juvenile court entered shelter care orders on August 22, 2016, and adjudicated the Children dependent on September 19, 2016.

Following the adjudication, Father visited the Children and participated in parenting classes through the Time Limited Family Reunification program. *Id.* at 30, 50, 88-89; Exhibit CYS-P (visitation log). This arrangement did not

_____

[1] The orphans' court entered decrees that same day confirming the consent of F.A.W. ("Mother") and terminating her parental rights voluntarily. Mother did not file an appeal.

[2] CYS's applications for emergency protective custody specified that Mother was residing with an alleged perpetrator of child sexual abuse. CYS averred that the alleged victim of the abuse was one of Mother's other children, who is not involved in this appeal.

- 2 -

last long, however, as Father was incarcerated in May 2017. N.T., 5/1/19, at 52. He pled guilty in October 2017 to a charge of possession with intent to deliver a controlled substance. N.T., 5/1/19, at 53; Exhibit CYS-I (Father's criminal docket). Father reported that he could be released from incarceration as early as January 2020, assuming that he did not commit any disciplinary infractions. N.T., 5/1/19, at 64, 107, 117, 136, 140.

Meanwhile, Father requested visits with the Children while incarcerated at the county jail. *Id.* at 57, 81. Father requested visits in June 2017 but the visits did not begin until CYS received a necessary court order in August 2017. *Id.* at 81. Father's visits ended after he was transferred to state prison in February 2018. *Id.* at 57. Following the transfer, CYS arranged for Father to have twice-weekly phone calls with the Children. *Id.* at 57-58. In addition to the phone calls, Father began sending the Children letters and artwork, and contacted the CYS caseworker to inquire about the Children. *Id.* at 60, 63.

CYS filed petitions to terminate Father's parental rights to the Children involuntarily on September 25, 2018. The orphans' court conducted a hearing on May 1, 2019. Father remained incarcerated at the time of the hearing and participated using a videoconferencing system. Father also received court-appointed counsel. Thereafter, the court entered decrees terminating Father's rights on May 28, 2019. He timely filed notices of appeal on June 24, 2019, along with concise statements of errors complained of on appeal.

Father now raises the following claims for our review:

A. Did the [orphans' c]ourt commit an error of law and abuse of discretion when it terminated the parental rights of [Father] to his daughters, [the Children,] pursuant to 23 Pa.C.S.A. § 2511 et. [*sic*] seq.?

B. Did the [orphans' c]ourt commit an error of law and abuse of discretion when it determined the burden of clear and convincing evidence was met in terminating the parental rights of [Father] pursuant to 23 Pa.C.S.A. § 2511 et. [*sic*] seq.?

C. Did the [orphans' c]ourt commit an error of law and abuse of discretion when it determined that the conditions that lead [*sic*] to the removal or placement of the [C]hildren continue to exist and that Father could not or would not remedy those conditions within a reasonable period of time 23 Pa.C.S.[A.] § 2511(5) and (8)?

D. Did [Father's] filing appropriately follow Pa.R.A.P. 341 because each appeal for each child only appealed one court order, specifically, the [decrees] terminating Father's parental rights?

Father's Brief at 5-6 (suggested answers omitted).[3]

_____

[3] Regarding Father's issue "D," he filed three separate notices of appeal from the decrees terminating his parental rights. In the notices of appeal, Father indicated that he intended to appeal from the termination decrees only. He also attached only the termination decrees to the notices of appeal. However, the notices of appeal included the docket numbers from both the Children's termination and dependency matters. This Court issued an order on July 17, 2019, directing Father to show cause why we should not quash his appeal. ***See Commonwealth v. Walker***, 185 A.3d 969, 977 (Pa. 2018) (holding that the failure to file separate notices of appeal from an order resolving issues on more than one trial court docket "requires the appellate court to quash the appeal"); ***Commonwealth v. Creese***, 216 A.3d 1142, 1144 (Pa. Super. 2019) ("We read our Supreme Court's decision in ***Walker*** as instructing that we may not accept a notice of appeal listing multiple docket numbers, even if those notices are included in the records of each case."). Father responded on August 1, 2019, stating that he intended to appeal the termination decrees and included the dependency docket numbers solely for reference. He further requested that his notices of appeal be amended to remove the dependency docket numbers. Given that it is clear Father intended to appeal only from the decrees terminating his parental rights, and given that he filed one notice

We apply the following standard of review when considering an appeal from a decree terminating parental rights involuntarily:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

> . . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

_____

of appeal for each decree, we discern no violation of **Walker**, and we do not quash his appeal.

- 5 -

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the orphans' court terminated Father's parental rights pursuant to Section 2511(a)(1), (5), (8), and (b).[4] We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate pursuant to Section 2511(a)(8) and (b), which provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any

---

[4] While the orphans' court cites Section 2511(a)(2) in its opinion, it provides no substantive analysis of the requirements of that subsection. In addition, CYS requested termination in its petitions pursuant to Section 2511(a)(1), (5), (8), and (b) only.

efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

\*\*\*

23 Pa.C.S.A. § 2511(a)(8) and (b).

We first consider whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(8):

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa. Super. 2003). It is important to note that Section 2511(a)(8) does not require consideration of a parent's willingness or ability to remedy the conditions that led to the removal of his or her child. *In re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa. Super. 2006). In addition, this Court defines what constitutes the relevant conditions somewhat broadly. We have held, for example, that a parent failed to remedy the conditions that led to her child's placement when the placement resulted primarily from the parent's positive drug test for cocaine and the parent was later incarcerated for drug offenses. *See In re C.L.G.*, 956 A.2d 999, 1006 (Pa. Super. 2008) (*en banc*) ("Mother's conviction and subsequent term of incarceration derives directly from her 'drug issues,' it is a part of the original reasons for the removal of C.L.G. from Mother's care and forms a basis for the termination of Mother's parental rights pursuant to Section 2511(a)(8).").

In this case, Father contends that the evidence presented during the hearing did not support the termination of his parental rights. Father's Brief at 14, 23. He argues that he did everything he could to maintain a relationship with the Children by visiting them, sending them letters, and calling them on the phone, even while incarcerated. *Id.* at 15-18, 21-22, 24, 27. Father also asserts that his release from incarceration is imminent and that he will work quickly following his release "to obtain housing and remedy any outstanding conditions." *Id.* at 15, 19, 24, 28. He extols the progress he made prior to his incarceration, which included obtaining housing, completing five parenting classes, and testing negative on drug screens. *Id.* at 15-16, 24, 27. Father explains that, upon his release, he intends to reside in a halfway house, regain custody of the Children, and move to North Carolina with his girlfriend, R.H. *Id.* at 26. Finally, he stresses that the orphans' court interviewed D.A.L.W., and that the child expressed her desire to live with both him and her foster parents. *Id.* at 18. Father insists that he and the Children share a bond. *Id.* at 21-22.

The orphans' court explained its decision to terminate Father's parental rights in its opinion, as follows:

> Father alleges that he has made great efforts to keep in [] contact with the [C]hildren while he has been in prison. That is true. However, the past is prologue to the future. The [C]hildren were removed from Mother's care largely because of her continuing drug use and living conditions on August 15, 2016. Father was not an available resource to take care of the [C]hildren at that time. For almost nine months, from August 15, 201[6], until he went to prison on May 3, 2017, Father made token efforts

to comply with the family service plan and to provide a safe and permanent home for the [C]hildren. It was not until he was jailed for drug delivery (again) that he corresponded with the [C]hildren and called them regularly.

Father has no bond with the younger two children. He has not seen them in over two years. He has not had them in his custody in over three years. They do not know him. [D.A.L.W.] is old enough to remember him and have a bond. However, in her young mind she does not understand the ramifications of suddenly being in her Father's custody in a strange place with different people. She does not understand that the chance for a healthy physical and emotional life will be greatly jeopardized if she is taken from her stable, healthy environment and placed in a very undefined environment.

Father's plan for the [C]hildren is frightening. His significant other appears to be well-meaning. But she spent time in jail last year and is now living in North Carolina waiting for Father's possible release in January 2020. Father may likely be released from prison in January 2020, but that is uncertain. It is questionable whether his addition[al] six years of supervision could be transferred to North Carolina. His prior income appears to be from illicit drug sales. There is no financial plan for taking care of the [C]hildren. There was no plan prior to his incarceration in 2016 through May[]3, 2017.

Orphans' Court Opinion, 5/24/19, at 8-10.

After a careful review, we conclude that the record supports the decision

of the orphans' court to terminate Father's parental rights pursuant to Section

2511(a)(8). As detailed above, the orphans' court removed the Children from

Father's care[5] on August 15, 2016. By the time of the termination hearing on

---

[5] Significantly, this Court has explained that a trial court may only terminate the rights of a parent pursuant to Section 2511(a)(8) if the subject child "has been removed from the care of the parent[.]" 23 Pa.C.S.A. § 2511(a)(8); *see In re C.S.*, 761 A.2d 1197, 1200 (Pa. Super. 2000) (*en banc*) (concluding that termination was inappropriate under Sections 2511(a)(5) and (8) "because

May 1, 2019, the Children had remained in foster care for over thirty-two months, well beyond the twelve-month requirement of Section 2511(a)(8).

Moreover, it is clear that Father had failed to remedy the conditions that led to the Children's removal. As the record confirms, the primary reason that Father was unable to care for the Children at the time of their removal was his lack of appropriate housing. N.T., 5/1/19, at 18. Father remained without appropriate housing during the hearing, due to his incarceration. Further, it was not clear when, if ever, he would obtain appropriate housing.[6] Contrary to Father's assertions on appeal, he testified that a January 2020 release date was not guaranteed and that he may not be released until later if he commits any disciplinary infractions before that date.[7] *Id.* at 117, 136, 140 ("Like if I

_____

the record reflects that C.S. was never in Appellant's care and, therefore, could not have been removed from his care."). Father's testimony at the hearing appeared to indicate that the Children spent most of their time living with him after he and Mother separated, but prior to CYS's involvement. N.T., 5/1/19, at 107-09. Father added that, when CYS became involved, "I was staying at [Mother's] sister's house, so yes, I was still around the girls, both of us was. [*sic*]" *Id.* at 110. Therefore, we conclude that the Children were "removed from the care" of both Father and Mother pursuant to Section 2511(a)(8).

[6] In reaching this conclusion, we observe that Section 2511(b) prohibits trial courts from terminating parental rights based solely on environmental factors, such as inadequate housing, "if found to be beyond the control of the parent." 23 Pa.C.S.A. § 2511(b). In this matter, the orphans' court did not find that Father's lack of housing was beyond his control. Father's lack of housing was a direct result of his criminal activity, which was clearly within his control.

[7] Father testified that his parole would not expire until 2026. N.T., 5/1/19, at 140.

get a write-up, then that could stop me from getting out."). Even assuming that Father obtains his release in January 2020, his ability to maintain long-term stability for the Children afterward is questionable at best. It is important to note that this is only Father's most recent drug-related criminal conviction. Father admitted that he incurred prior drug-related convictions in 2006 and 2015.[8] *Id.* at 131-32. Father testified that, after his release, he planned to reside in a halfway house, regain custody of the Children, and then move to North Carolina with his girlfriend, R.H., assuming that he is able to transfer his parole there. *Id.* at 118-19. Troublingly, the record reveals that R.H. has a significant criminal record of her own. She testified that she spent time in jail during the previous year and was now on probation because of an incident during which "I gave a friend a ride and I didn't know that he was robbing a pizza delivery guy." *Id.* at 166.

Finally, terminating Father's parental rights will best serve the Children's needs and welfare.[9] The record confirms that Father has made significant

_____

[8] Father's criminal docket reveals that he received numerous charges in 2015, several of which were drug related, but that he pled guilty to only conspiracy to commit flight to avoid apprehension. *See* Exhibit CYS-H (Father's criminal docket).

[9] Both Section 2511(a)(8) and (b) require that a court considering termination of parental rights assess the needs and welfare of the subject child or children. However, the Section 2511(a)(8) needs and welfare analysis is distinct from the Section 2511(b) needs and welfare analysis, and courts must address each separately. *See C.L.G*., 956 A.2d at 1009 ("[W]hile both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the 'needs and welfare of the child,'

efforts to maintain a relationship with the Children during his incarceration. It is also clear that the oldest of the Children, D.A.L.W., who was six-and-a-half years old at the time of Father's incarceration, and eight-and-a-half years old at the time of the hearing, shares a bond with Father. During an *in camera* interview, she stated that she would like to live with both her foster parents and her biological parents. *Id.* at 12, 15 ("I want to go back with my mom and dad, too. . . . Maybe every two weeks I switch, like I visit then I switch.").[10, 11]

_____

. . . they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).").

[10] The record supports the finding of the orphans' court that the younger two children, J.L.W. and L.D.R.W., do not share a bond with Father, as they were both very young at the time of his incarceration. J.L.W. was three years old at the time of Father's incarceration and five years old at the time of the hearing, while L.D.R.W. was one-and-a-half years old at the time of Father's incarceration and three-and-a-half years old at the time of the hearing.

We note that Father cites to page ninety-three of the reproduced record, which corresponds to page ninety-three of the notes of testimony, for the proposition that J.L.W. also shares a bond with him. *See* Father's Brief at 22 ("The caseworker testified that, when she last saw J.L.W. and her [f]ather together they appeared to be bonded."). However, the testimony Father cites clearly refers to D.A.L.W. rather than J.L.W.

[11] The orphans' court appointed counsel to represent D.A.L.W.'s legal interests during the termination proceedings. The court also appointed a separate GAL, who represented the legal interests of J.L.W. and L.D.R.W., as well as the best interests of all three of the Children. At the court's direction, counsel and the GAL submitted letters after the hearing, explaining their respective positions. Counsel opposed termination, emphasizing that D.A.L.W. wanted to maintain contact with her biological parents. However, the GAL supported termination, contending that it would be in the Children's best interests. Both counsel and the GAL have filed briefs in this Court arguing their positions.

However, the Children's relationship with Father was only one of many factors for the orphans' court to consider. The record demonstrates that the Children share a significant bond with their pre-adoptive foster parents who, unlike Father, have shown that they are capable of providing the Children with safety, stability, and permanence. *See T.S.M.*, 71 A.3d at 268 ("Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents."). The Children have resided with the foster parents since August 2017. N.T., 5/1/19, at 20. CYS caseworker, Kerri Shaylor, testified that she has observed the Children in the foster home, and that they appear "happy, they're always dressed appropriately, have clean clothes, their hair is always done nice, . . . they interact with the other children in the home. They call the foster parents 'mom and dad' at this point." *Id.* at 67. Given that Father failed to remedy the conditions that led to the Children's placement for over thirty-two months, given that he will not be able to remedy those conditions, and given that the Children are thriving in foster care, it was within the discretion of the orphans' court to conclude that termination would best serve the Children's needs and welfare. *See In re Adoption of C.D.R.*, 111 A.3d 1212, 1220 (Pa. Super. 2015) ("Clearly, it would not be in Child's best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent."). Thus, we affirm the decrees terminating Father's parental rights pursuant to Section 2511(a)(8).

We next consider whether the orphans' court committed an abuse of its discretion by terminating Father's parental rights pursuant to Section 2511(b). The requisite analysis is as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

For the reasons already discussed, the record supports the conclusion of the orphans' court that terminating Father's parental rights will best serve the needs and welfare of the Children pursuant to Section 2511(b). By the time of the hearing in this matter, the Children had remained without parental care for over thirty-two months, during which Father failed to remedy his lack of appropriate housing. Father was incarcerated in May 2017. By May 2019,

he could provide the court with only a speculative plan for acquiring housing, which required that he obtain his release at the earliest possible date, regain custody of the Children, and then move to North Carolina to live with R.H. While the Children maintain a relationship with Father, and while D.A.L.W. in particular has expressed a desire to spend half of her time living with Father, it is the Children's pre-adoptive foster parents who have shown that they are capable of providing the safety, stability, and permanence the Children need. As this Court has emphasized, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating Father's parental rights to the Children involuntarily. Therefore, we affirm the court's May 28, 2019 decrees.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/27/2020

- 15 -